**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Contract Manufacturing Services, Inc. d.b.a AllFab Railings & Metalworks <br><br>                 Plaintiff, <br><br>     v. <br><br> RB Global, Inc.; Rouse Services LLC; United Rentals, Inc.; Sunbelt Rentals, Inc.; HERC Rentals Inc.; HERC Holdings, Inc.; H&E Equipment Services, Inc.; and Sunstate Equipment Co., LLC, <br><br>                 Defendants. | Case No: 3:25-cv-1262 _____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Contract Manufacturing Services, Inc. ("CMS" or "Plaintiff"), brings this antitrust class action on behalf of itself and on behalf of a Class of others similarly situated, seeking damages, treble damages, and other remedies under the Sherman and Clayton Acts. The Defendants include RB Global, Inc. and its subsidiary Rouse Services LLC (together, the "Rouse Defendants"), along with United Rentals, Inc., Sunbelt Rentals, Inc., HERC Rentals Inc., HERC Holdings Inc. (collectively, "HERC"), H&E Equipment Services, Inc. ("H&E"), and Sunstate Equipment Co., LLC ("Sunstate") (collectively, the "Rental Company Defendants" and together with the Rouse Defendants, the "Defendants").

## I.    INTRODUCTION

1.    This action alleges that Defendants formed and have maintained an illegal, horizontal price-fixing agreement through which Defendants have conspired to fix, maintain, and/or stabilize rental prices for rental equipment and tools used for construction, entertainment, and other industries ("Rental Equipment"), from at least March 31, 2021 to the present (the "Class Period").

2.    The Rental Equipment at issue is used in commercial and residential construction projects and includes equipment such as excavators, backhoes, bulldozers, skid steers, compaction equipment, loaders, and lifts, among others.

3.    In 2010, at a time when the Rental Equipment industry was fragmented and featured price competition that reduced prices for rental customers, a former CEO of Hertz Equipment Rental Corp (now HERC Rentals) called for industry changes, claiming that the "pricing pain that is being felt throughout the equipment rental industry right now is largely self-inflicted," due to "[p]oor rate management."

4.    Recognizing that they could collectively increase pricing in the Rental Equipment market, the Rental Defendants engaged in a continuing horizontal agreement and a conspiracy with the Rouse Defendants to leverage the power of analytics technology to effectuate and maintain

artificially inflated rental rates for their equipment.

5.    At Rental Defendants' urging, Rouse developed a digital platform through Rouse Services that collects invoice-level transactional and inventory data for Rental Equipment and uses that data to calculate and disseminate to Rouse clients, including the Rental Defendants, a Rouse Rental Insights price ("RRI Price") for adoption in the market.

6.    Providing such invoice-level transactional and inventory data is a mandatory condition for using Rouse Services.  In turn, the data managed and analyzed by Rouse represents over $65 billion in Rental Equipment fleet value, $28 billion in rental revenue, and $21 billion in annual sales transaction data, amounting to a substantial consolidation of market data. Rouse uses that data to provide its clients, including Rental Defendants, with daily reports of industry benchmarks for rental rates, physical utilization, dollar utilization, fleet age, and other key performance indicators.

7.    While marketed as a way for Rental Defendants and co-conspirators to optimize their rental and utilization rates, Rouse Services actually offers Rental Equipment companies the opportunity to conspire and join a price-fixing cartel ("the Rouse Cartel").

8.    Defendants' scheme has succeeded. As a result of participating in the Rouse Cartel, the Rental Defendants have experienced record profits and skyrocketing share prices.

9.    Industry executives openly discuss their "disciplined" market—a market in which the Rental Defendants have agreed to eliminate price competition, allowing them to reap the benefits of higher prices and margins.  But this "disciplined" lack of pricing competition has been to the direct detriment of Plaintiff and members of the Class and has caused them to pay supra-competitive prices for Rental Equipment during the Class Period.

10.    Rouse and the Rental Defendants have violated and continue to violate U.S. antitrust laws. Instead of setting their rates independently, the Rental Defendants, while controlling much of the U.S. Rental Equipment market, outsource their rate-setting to Rouse as a common entity. By acting

collectively through Rouse, the Rental Defendants eliminate price competition between themselves.

## II.    JURISDICTION AND VENUE

11.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and members of the Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

12.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

13.    Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this district. For example, Defendant United Rentals maintains its corporate headquarters in Stamford, Connecticut.

14.    This Court has personal jurisdiction over each Defendant because each Defendant, among other things: (a) transacted business throughout the United States and in this District; (b) rented and/or delivered substantial quantities of Rental Equipment throughout the United States and in this District; (c) had substantial contacts with the United States and this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons and businesses residing in, located in, or doing business throughout the United States and in this District.

15.    The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

4

16.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## III.  PARTIES

### Plaintiff

17.     Plaintiff Contract Manufacturing Services, Inc. is a North Dakota corporation with its principal place of business at 4102 7th Ave N Fargo, ND 58102. Plaintiff rented Rental Equipment directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

### Defendants

18.     Defendant RB Global, Inc. is a public company, traded on the Toronto and New York Stock Exchanges, that is legally domiciled in Canada and with U.S. headquarters located at 2 Westbrook Corporate Center, Suite #1000, Westchester, Illinois 60154.

19.     Defendant Rouse Services LLC is a wholly owned subsidiary of RB Global. Rouse maintains its headquarters in Beverly Hills, California. RB Global acquired Rouse in 2020 for $275 million.

20.     Defendant United Rentals, Inc. is a publicly traded company incorporated in Delaware with its principal place of business in Stamford, Connecticut. United Rentals is the largest equipment rental company in the world, operating over 1,400 retail locations across North America.

21.     Defendant Sunbelt Rentals, Inc. is incorporated in North Carolina and maintains its principal place of business in Fort Mill, South Carolina. Sunbelt Rentals is the second largest equipment rental company in the United States and Sunbelt Rentals reported $9.3 billion in revenue from its U.S. business in 2024. Its U.S. fleet is worth over $15 billion.

22.     Sunbelt Rentals is a division or subsidiary of Ashtead Group PLC. Ashtead Group PLC maintains its headquarters at 100 Cheapside, London EC2V 6DT, United Kingdon. Ashtead PLC does

business as and operates under the brand name of Sunbelt Rentals, doing business in the United States, Canada, and the United Kingdom. Ashtead Group PLC is publicly traded on the London Stock Exchange.

23.      Defendants HERC Rentals Inc. and HERC Holdings Inc. are public companies incorporated under the laws of Delaware with their principal place of business in Bonita Springs, Florida. The majority of HERC Rentals' business comes from equipment rental. HERC also sells used rental equipment and new equipment, parts, and supplies. HERC Rentals was formerly known as Hertz Equipment Rental Corp. HERC has over 451 locations in the U.S. and Canada. Its fleet represents a total original equipment cost ("OEC") of $7 billion. HERC reports that its total revenue reached a record $3.6 billion in 2024.

24.      Defendant H&E Equipment Services is a publicly traded company incorporated in Delaware with its principal place of business in Baton Rouge, Louisiana. H&E Equipment operates a fleet of rental equipment including aerial work platforms, earthmoving, material handling, and other general and specialty lines. H&E Rentals had 2024 revenues over $1.5 billion. Equipment rentals provided over half of its gross profit.

25.      Defendant Sunstate Equipment Co., LLC is incorporated in Delaware and has its principal place of business in Phoenix, Arizona. Sunstate Equipment is one of the largest rental equipment companies in the U.S with approximately 100 branches in 16 states. Sunstate Equipment is a wholly owned subsidiary of Sumitomo Corporation Group, which is publicly traded on the Tokyo Stock Exchange and listed through an American Depositary Receipt on the New York Stock Exchange.

**Unnamed Conspirators**

26.      Various co-conspirators, including rental equipment companies and other industry participants, also participate in the price-fixing conspiracy along with Defendants and have performed

acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not the co-conspirators are named as Defendants in this Complaint.

27.    The anticompetitive and unlawful acts alleged against Defendants in this complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives while actively engaged in the management, direction, or control of Defendants' businesses or affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

28.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

29.    Defendants are additionally liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

IV.    **FACTUAL ALLEGATIONS**

**A. Formation and Operation of the Rouse Cartel.**

30.    Prior to the emergence of Rouse's services, rental equipment companies individually assessed market conditions—including cost, supply, and demand—to set their own rental rates.

31.    The launch of Rouse's pricing and analytics platform fundamentally disrupted this decentralized model. Rouse's system was specifically designed to inflate equipment rental rates across the industry by centralizing pricing authority.

32.    Through agreements with Rouse and each other, members of what has become known as the Rouse Cartel surrendered control of their rental pricing to Rouse's "RRI Price." In doing so, they also agreed to share highly sensitive, proprietary data—covering pricing, utilization, and other

business metrics—with Rouse and their direct competitors. This broad exchange of information enabled Rouse to orchestrate industry-wide rental behavior, effectively coordinating prices.

33.     Rouse evolved from Ritchie Brothers, a Canadian auction firm that pivoted toward data services in the early 2000s. By the late 2000s, key players like HERC Rentals, Sunbelt, and United Rentals approached Rouse to build a centralized platform for managing rental assets and data. These companies believed that by pooling sensitive information, they could gain collective "visibility" and control over pricing trends.

34.     Rouse markets its revenue management tools, especially RRI Price, as a way for companies to set rates above competitive market levels. By discouraging reliance on frontline sales staff and anecdotal inputs, Rouse encourages companies to standardize pricing through shared data. This form of algorithmic intermediation closely resembles practices that have come under scrutiny from U.S. antitrust authorities.

35.     In 2010, Dan Kaplan, a former executive at HERC's predecessor, lamented the "race to the bottom" in rental pricing. He called for more deliberate fleet management and pricing discipline, signaling a shift toward collective industry restraint Echoing Kaplan, other executives criticized widespread rate-cutting, warning it undermined the industry's value and sustainability.

36.     In 2011, the American Rental Association (ARA), in collaboration with Rouse and major rental firms, released standardized performance metrics—known as the ARA Rental Market Metrics—aimed at aligning how companies measured utilization and fleet efficiency.

37.     Just a month later, Rouse launched its analytics platform, onboarding clients such as HERC, H&E Equipment, and United Rentals. That same year, Rouse extended invitations to Sunbelt and Sunstate, urging them to join this data-sharing initiative.

38.     By 2015, over 50 companies were participating in Rouse's benchmarking program. Rouse attracted participants by offering free access to market insights in exchange for their data, which

in turn enriched the RRI Price and attracted even more contributors.

39.     The system created a self-reinforcing loop: as more companies submitted data and followed Rouse's pricing recommendations, the influence of the RRI Price grew, reshaping industry expectations and behavior.

40.     In 2020, Ritchie Brothers formally acquired Rouse, integrating its analytics with the auction giant's marketplace services. This allowed Rouse to scale its RRI program further and offer a full-service suite to rental clients.

41.     Post-acquisition, Rouse's tools enabled rental firms to optimize both rental operations and equipment liquidation through the Ritchie Brothers platform, thereby deepening the integration of Rouse's pricing signals across the market.

42.     By 2024, more than 400 rental firms in North America—including all of the top 10 and 70 of the top 100—had adopted RRI. Rouse claims that its database represents over 60% of the North American market, creating unprecedented visibility and coordination among industry leaders.

43.     Rouse's marketing campaigns underscore the collaborative nature of the platform, emphasizing that its tools are most effective when widely adopted. Rental companies participate not only to match competitor behavior, but to join an ecosystem that allows them to raise prices without fear of competitive loss.

44.     Many companies willingly shared internal data with Rouse in return for pricing power. Participation in this information exchange allowed them to raise rates in concert with competitors— without appearing to do so unilaterally.

45.     As Rouse often touts, hundreds of rental firms across the U.S. now rely on its services, creating a broad coalition that influences pricing across the industry.

46.     Rouse openly acknowledges that its data comes directly from client billing systems— not theoretical quotes—making its benchmarks uniquely accurate and highly effective for aligning

company behavior.

47.    Rental companies join in the collusion with Rouse and with each other by providing Rouse with their competitively sensitive data.  As Rouse states on its website, "[w]e pull data directly from our clients' systems to ensure our rate benchmarks are based on actual rental invoices billed to customers, not list rates or quoted rates."  Rouse also admits to "provid[ing] clients with comparisons of the rental rates, utilization, and other key performance metrics to industry benchmarks by Cat Class specific to each market they operate in."

48.    Rental companies share this data with Rouse because they know that Rouse will use it to help them and their co-conspirators fix and raise prices.  They share competitively sensitive information so they can benefit from the data their customers similarly provide to Rouse.

49.    Rental companies also demonstrate their commitment to the Rouse Cartel by adhering to RRI Price determinations, and further demonstrate their commitment to the Rouse Cartel by tracking and rewarding their sales representatives who comply with Rouse's RRI Price.

50.    On information and belief, Rouse has entered into contracts for the exchange of competitively sensitive information with hundreds of Rental Equipment companies, including each of the Rental Defendants, evidencing the price-fixing conspiracy alleged herein.

51.    These agreements expressly or impliedly contemplate and require that the rental companies will share their competitively sensitive data and information with their rivals through Rouse, and provide that they will have access to Rouse's database and RRI Pricing, which pools competitively sensitive information from rivals, and that they will use Rouse's RRI pricing.

52.    Rouse boasts that its pricing information comes from data from over 400 companies, and highlights that its data comes from actual rental invoices sent to customers, as opposed to list rates or quoted rates.  Thus, Rouse claims that its system is the only one that offers accurate "benchmarking" in the rental equipment industry, and it claims to offer the exclusive source for benchmark rate and

utilization data for the industry.

53.    As explained by Brad Spitzer, Rouse's Director of Client Services, in a November 2024 podcast interview, it "helps out the entire industry really by allowing people to have more visibility into their performance and their market and react and make better decisions."  He further encouraged industry participants to "listen to the data and the market around them" rather than listening to their customers.

54.    Demonstrating that concerted action is the very point of the RRI platform and business model, Rouse also acts as a go-between for its clients, telling them who else is a part of the Rouse Cartel, and which pricing/utilization strategies they are using.  This enables Rouse to be able to instruct each rental company, including the Rental Defendants, how to implement similar strategies and pricing moves, with confidence that those will be shared or mirrored by their competitors.

55.    Rouse also provides ongoing marketing and training with its clients, as well as a private online portal for customers, through which Rouse can continue to reinforce the continued use of, and compliance with, the RRI Price by its clients, including Rental Defendants.

**B.  Rouse's Use of Client Data to Calculate the RRI Price.**

56.    Rouse collects invoice level transaction data and nightly fleet snapshots from participating rental companies through its Rental Metrics Benchmark Service.  Rouse then reports industry benchmarks for rental rates, utilization, fleet age, and other performance metrics at a local market level.  Participating rental companies receive an initial comparison of their rental rates, utilization, and other key performance metrics to local benchmarks.  They receive a summary level comparison of their rental rates and other metrics to local market benchmarks every month, with the option to purchase more detailed reporting.

57.    As part of creating the RRI Price, Rouse requires its clients to agree to submit every line item of every invoice that the rental company charges its clients, every day, as well as real-time

utilization information on their entire fleet. The data included on these invoices is competitively sensitive and non-public, and includes data on utilization, fleet age and value, rental duration terms, and, most significantly, pricing.

58.    This non-public data is collected automatically on a daily basis through Rouse's platform. Rouse then collates and conforms the data to ARA rental market metrics.

59.    Rouse uses a proprietary, common formula to calculate the RRI Price based on the pooled data and Rouse's view of demand and market conditions. Rose provides uses with the same RRI Prices, based on the pooled data from competitors and on Rouse's common formula.

60.    Rouse offers RRI Prices by category and class (which Rouse refers to as "Cat Class") and specific to a client's local market. Rouse also provides comparisons of a client's rental rates compared to its competitors for monthly, weekly, and daily rates, as well as providing "benchmarks" in "ancillary revenue categories such as collecting fuel charges, environmental fees, delivery and pickup charges and damage waiver versus [their] competition."

61.    With its continuous incoming stream of data, Rouse updates its RRI Prices continuously, offering High, Medium, and Low RRI Price for each rental. Rouse customers are also shown how their prices compare to the RRI Price.

62.    While Rouse refers to its RRI price as a "benchmark," it is actually a tool for Rental Defendants to coordinate and implement a price-fixing conspiracy, and to use it to identify, set, and share a common price and avoid price competition.

63.    The Rental Defendants have been aware that their competitors also contribute their competitively sensitive data to Rouse, and that they receive the same outputs from Rouse. While it would be against each Rental Defendants' self-interest to share its competitively sensitive data with Rouse absent collusion, it is in Rental Defendants' self-interest to do so if they know they will receive the benefit of their competitors' competitively sensitive pricing and key metrics data in return, along

with assurances that all competitors are receiving the same pricing recommendations.

**C. Rental Companies' Use of RRI Price to Implement the Price-Fixing Conspiracy.**

64.    Rental Defendants use the Rouse RRI Price to set their own rental prices and adjust them based on market condition data provided by Rouse.

65.    Rouse touts that if a rental equipment company wants to compare its prices, utilization, fleet age, or other ancillary revenues to its competition in any given market for any given piece of equipment, all it takes is a few keystrokes.  And its customers tout the same benefits, emphasizing that Rouse's services and data allow them to compare where they sit in the marketplace on any metric and make adjustments.

66.    To facilitate expansion, monitoring, and enforcement of the RRI pricing, Rouse further ensures that its RRI pricing is as accessible to as many companies as possible in the market by partnering with other companies in other segments of the Rental Equipment market to have the Rouse RRI integrated into other software and business management platforms used by Rental Equipment companies, including, for example: Alert Superior Rental Software, CDKGlobal, Emphasys, Equipment Business Software Solutions, FameRental, FocalPoint Software, Integrated Rental, InTempo, Point of Rental Software, Texada, Wynne, integraSoft, and Flyntlok.

67.    Rouse also meets with and advises clients including the Rental Defendants on how to use the RRI Price, how to maximize profits using the RRI Price, and how to use Rouse's other tools. Using Rouse's platform and data outputs, Rouse's clients can compare details of their business to their comnpetitors and the RRI price to confidently maximize pricing.  Rouse's clients thus can police adherence to the conspiracy by continuously ensuring that they are charging as much as their competitors relative to the RRI price.

68.    Rouse directly discourages price competition among competitors by allowing all Rouse clients to see actual prices charged in the market relative to the RRI Price, and by encouraging its

clients to charge the RRI Price or higher.

69.    Rouse also provides detailed information about a client's sales team, including comparisons of each sales representative's performance compared to the RRI Price, and comparisons of a sales representative's performance compared to what Rouse believes they should be selling. This enables and encourages Rouse clients to police their sales representatives' adherence to the RRI Price and to the Rouse Cartel.

70.    Members of the Rouse Cartel have stated that they set their prices at the recommended RRI price 90% of the time.

71.    Through these uses of Rouse Services and industry-wide adoption of the RRI Price, Rental Defendants have seen and enjoyed record profits. Rouse clients made up 8 of the top 10 largest rental companies as of 2021, and 63 of the top 100.

72.    The lack of price competition has fueled steadily increasing rental volumes for the Rental Defendants, who comprise a majority of the largest rental companies and who control a substantial majority of the construction rental market. Defendant United Rentals' total rental volume in 2021 increased 14.9% over 2020, and increased another 23.3% in 2022. Defendants Sunbelt Rentals, HERC, and H&E all experienced similar and comparable increases in rental volumes over the same periods.

73.    Rental Defendants, Rouse, and their co-conspirators have violated and continue to violate U.S. antitrust laws, by collaborating to set their prices in concert using Rouse as an intermediary. This has enabled Rental Defendants, Rouse, and their co-conspirators to effectively eliminate price competition and to artificially increase their prices in the Rental Equipment market during the Class Period.

**D.  The Industry's Structure Supports the Existence of a Conspiracy.**

74.    The Rental Equipment Industry features market characteristics (sometimes referred to

14

as "plus factors") that make collusion more efficient, more profitable, and thus more likely, including: (a) high barriers of entry and exit; (b) inelastic consumer demand; (c) market concentration; (d) relative product fungibility; (e) exchanges of competitively sensitive information among horizontal competitors; and (g) numerous opportunities to collude at events and through trade associations.

75.    **Barries to Entry and Exit**.  The Rental Equipment industry features high barriers to entry and exit because of the significant capital requirements necessary to acquire, store, and maintain the large, expensive pieces of equipment rented out to construction companies.  Each of the Rental Defendants controls and rents out several billion dollars' worth of equipment.  The high expenses and inventory required to enter the market also make it difficult to exit the market, as companies cannot easily liquidate or write off the significant capital expenses required to enter.

76.    **Inelasticity.**  Demand for rental equipment is relatively inelastic because the only feasible alternative to renting the specialized equipment is buying the equipment, which, as described above, is extremely expensive and not feasible for a lot of contractors.  Thus, the lack of feasible substitutes makes it difficult to combat cartel pricing in the rental market.

77.    **Market Concentration.**  Each of the Rental Defendants has grown substantially through mergers and acquisitions, and together they control a substantial portion of the Rental Equipment market.  The market is dominated by the ten largest companies, all of which are in the Rouse Cartel.

78.    **Product Fungibility**.  Construction equipment is relative fungible, in that there are not often significant differences between different brands of similar products.  This is reflected by Rouse's pricing of rental equipment based on "Cat Classes," as opposed to distinguishing between brands or other unique product characteristics.  This makes it difficult for rental equipment companies to charge higher prices based on the brands or other unique characteristics of the equipment they offer, and it therefore incentivizes such companies to look for other ways such as collusion to raise prices.

79.    **Sharing Competitively Sensitive Information**.  Reciprocal sharing of firm-specific competitively sensitive information that would normally remain confidential leads to a strong inference of active collusion.  As described above, Rouse collects invoice-level transaction data and fleet snapshots on a daily basis from participating rental companies and reports its "benchmark" rental rates and other key performance metrics at a local market level based on its analysis of this continuous stream of non-public, sensitive data.

80.    **Opportunities for Collusion**.  Rouse and participating rental companies have opportunities to conspire through trade associations and through other events and platforms sponsored by Rouse.  For example, Rouse and the Rental Defendants all belong to the ARA, which offers training, consumer research, and networking opportunities, including trade shows.

## V.    IMPACT ON INTERSTATE TRADE AND COMMERCE

81.    Beginning at least as early as March 31, 2021, and continuing until the present, Defendants engaged in a continuing conspiracy or combination in restraint of trade in violation of the Sherman Act. During the Class Period, the Rental Defendants rented substantial quantities of Rental Equipment in a continuous and uninterrupted flow in interstate commerce to customers located in states other than where the Rental Defendants provided their equipment rentals.

82.    Defendants' conspiracy had a direct, substantial, intended, and foreseeable impact on interstate commerce in the United States and its territories as the Defendants are a part of a multi-billion-dollar market that continues to grow. The Rental Defendants own facilities and equipment fleets in the United States and rented Rental Equipment in the United States. Furthermore, Defendants knew their rental services would enter the U.S. stream of commerce and would affect United States commerce including harm to Plaintiff and the proposed Class in the payment of supra-competitive prices for Rental Equipment.

83.    Defendants intentionally targeted their unlawful conduct to affect commerce, including

interstate commerce within the United States and its territories by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for Rental Equipment in the United States.

## VI.    ANTITRUST INJURY

84.    The Rouse Cartel directly damaged and continues to damage Plaintiff's business and restrains competition in the relevant market. Defendants' antitrust conspiracy had the following effects, among others:

a.    Price competition has been restrained or eliminated with respect to the pricing of construction rental equipment;

b.    Prices of Rental Equipment have been fixed, raised, maintained, or stabilized at artificially inflated levels;

c.    Renters of Rental Equipment have been deprived of the benefits of free and open competition; and

d.    Plaintiff and other Class members have paid higher and artificially inflated prices for Rental Equipment as a direct, foreseeable, and proximate result of Defendants' conduct.

85.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and/or maintain the price of Rental Equipment.

86.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

87.    But for Defendants' conspiracy, Plaintiff and members of the proposed Class would have paid less for Rental Equipment.

88.    The precise amount of the overcharge impacting the prices of Rental Equipment paid by Plaintiff and the Class can be measured and quantified using well-accepted economic models.

89.     By reason of the unlawful activities alleged herein, Defendants' actions substantially affected interstate trade and commerce throughout the U.S.

90.     By reason of the alleged violations of the antitrust laws, Plaintiff and the other members of the Class have sustained injury to their business or property, having paid higher prices for Rental Equipment than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiff and the other members of the Class have suffered damages in an amount presently undetermined. However, the precise amount of overcharge affecting the prices of Rental Equipment can be measured and quantified using well-accepted economic models. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish, remedy, and prevent.

## VII.    TOLLING OF THE STATUTE OF LIMITATIONS

91.     Plaintiff's and other Class members' rentals of Rental Equipment within four years prior to filing this Complaint are not barred by the applicable four-year statute of limitations. The statutes are not required to be tolled for these claims to be actionable.

92.     Defendants committed, or continued to commit, their antitrust violations within applicable periods of limitation. Defendants increased their prices and caused Plaintiff and other Class members to pay supra-competitive prices because of those increases. Accordingly, Defendants committed overt acts in furtherance of their conspiracy and their antitrust violations within any applicable period of limitations. Therefore, Defendants committed a continuing violation of the antitrust laws.

93.     As described herein, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct and used pretextual justifications to justify their price increases. Furthermore, price-fixing conspiracies like Defendants' conspiracies are inherently self-concealing.

94.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four-year statutes of limitations governing claims under the Sherman Act should be tolled pursuant to the doctrine of fraudulent concealment.

## VIII.   CLASS ACTION ALLEGATIONS

95.     Plaintiff brings this action for damages and injunctive relief on behalf of themselves and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3), with the Class initially defined to include ("the Class):

> All persons and entities in the United States and its territories that rented construction equipment directly from any of the Rental Defendants or their co-conspirators, or from any division, subsidiary, predecessor, agent, or affiliate of such Rental Defendant or co-conspirator, at any time during the period of at least March 31, 2021, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "Class Period").

96.     This class definition specifically excludes the following persons or entities: (a) any of the Defendants named herein; (b) any of the corporate Defendants' parent companies, subsidiaries, affiliates, or agents; (d) all governmental entities; (e) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (f) the judges and chambers staff in this case, as well as any members of their immediate families; and (g) all jurors assigned to this case.

97.     Plaintiff reserves the right to modify or amend the definition of the class before the Court determines whether certification is appropriate.

98.     **Numerosity.** The Class is so numerous and geographically dispersed across the United States that joinder of all members is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains tens of thousands of similarly situated proposed Class members. Class members are readily identifiable and are ones for which records should exist.

99.     **Common Questions Predominate**.: Numerous questions of law and fact are common

to the Class related to the existence of the anticompetitive conduct alleged, and the type and common pattern of injury sustained as a result thereof, including but not limited to:

      a.    whether Defendants engaged in an agreement, combination, or consispiracy to fix, inflate, maintain,, or stabilize the prices paid for Rental Equipment during the Class Period;

      b.    whether such agreements constituted violations of the Sherman Antitrust Act;

      c.    the identity of the alleged conspiracy's participants;

      d.    the duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

      e.    whether Defendants fraudulently concealed their misconduct;

      f.    whether and to what extent Defendants' anticompetitive scheme inflated prices of Rental Equipment above competitive levels;

      g.    the nature and scope of injunctive relief necessary to restore competition to the equipment rental market; and

      h.    the measure of damages suffered by Plaintiff and the Class.

100.    These and other questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class. Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

101.    **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class. Plaintiff and other Class members were injured by the same unlawful conduct, which resulted in their paying more for Rental Equipment than they would have in a competitive market.

102. **Adequacy of Representation**: Plaintiff will fairly and adequately represent the interests of the Class because Plaintiff rented Rental Equipment directly from a Rental Equipment Defendant within the U.S. during the Class Period. Plaintiff has no material conflicts with any other members of the Class that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is adverse to the interests of other members of the Class, and the infringement of rights and damages Plaintiff sustained are typical of those of other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation. Plaintiff intends to prosecute this action vigorously.

103. **Common Grounds for Injunctive Relief**: Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

104. **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

**IX.    CLAIMS FOR RELIEF**

## COUNT 1

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) for Restraint of Trade
**(On Behalf of a Nationwide Class)**

105.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

106.    Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engaged in interstate commerce in renting Rental Equipment to Plaintiff and the Class.

107.    Beginning in or around 2011, Defendants entered into and engaged in a contract, combination, conspiracy, or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of Rental Equipment in the United States.

108.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for Rental Equipment in the United States.

109.    In formulating and effectuating this conspiracy, Defendants and their co- conspirators did those things that they combined and conspired to do, including:

      a.    exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of Rental Equipment in the United States;

      b.    participating in meetings, conversations, and other communications among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of Rental Equipment in the United States;

<blockquote>

c.    participating in meetings, conversations, and other communications among themselves to implement, adhere to, and police the agreements they reached; and

d.    engaging in conduct designed to raise and stabilize the prices of Rental Equipment.

</blockquote>

110.    Defendants' acts in furtherance of their conspiracy included, but are not limited to the following:

<blockquote>

a.    Rouse created its RRI Price tool following the request of Defendants United Rentals, HERC Rentals, and H&E Equipment;

b.    Rouse advertised and sold its pricing tool to other rental companies with intent to raise rental prices and achieve greater profits;

c.    The Rental Defendants knowingly used the Rouse price tool, which incorporates other Defendants' real-time, private, confidential, competitively sensitive, and detailed internal pricing and utilization data;

d.    the Rental Defendants charged customers for rental equipment at the RRI price set by Rouse's pricing tool; and,

e.    Rouse empowered the Rental Defendants to enforce the collective Rouse prices.

</blockquote>

111.    Defendants' conduct in furtherance of their unlawful scheme was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

112.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to fix, maintain, raise, or stabilize prices of Rental Equipment

113.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, stabilize, and maintain the price of Rental Equipment.

114.    Defendants' conspiracy had the following effects, among others: (a) price competition in the market for Rental Equipment has been restrained, suppressed, and/or eliminated; (b) prices for Rental Equipment provided by the Rental Defendants have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; (c) Plaintiff and members of the Class who rented Rental Equipment from the Rental Defendants and their co-conspirators have been deprived of the benefits of free and open competition; and (d) renters of Rental Equipment paid artificially inflated prices.

115.    Defendants' production restrictions, price-fixing, and other actions in furtherance of their conspiracy, as Defendants intended, directly, substantially, and foreseeably increased prices that purchasers paid in the United States for Rental Equipment in the United States.

116.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for Rental Equipment purchased from the Rental Defendants and their co-conspirators than they would have paid in the absence of the conspiracy.  As a direct and proximate result, Plaintiff and other members of the Class have suffered damages in an amount to be determined at trial. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

117.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

118.    For this conduct, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Sections 4 and 26 of the Clayton Act (15 U.S. Code §§ 15 and 26).

## COUNT 2

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) for Conspiracy to Exchange Competitive Information
### (On Behalf of a Nationwide Class)

119.     Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

120.     Plaintiff pleads this legal theory separately and alternatively to the *per se* legal theory pled in Count 1, pursuant to Federal Rule of Civil Procedure 8 (d)(2) and (3).

121.     Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engaged in interstate commerce in renting Rental Equipment to Plaintiff and members of the Class.

122.     Beginning in or around 2011, Defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non- public information regarding Rental Equipment. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

123.     More specifically, Defendants' acts in furtherance of their conspiracy included, but are not limited to the following:

a.     Rouse created its RRI Price tool following the request of Defendants United Rentals, HERC Rentals, and H&E Equipment;

b.     Rouse advertised and sold its pricing tool to other rental companies with intent to raise rental prices and achieve greater profits;

c.     The Rental Defendants knowingly used the Rouse price tool, which incorporates other Defendants' real-time, private, confidential, competitively sensitive, and detailed internal pricing and utilization data;

d.     the Rental Defendants charged customers for rental equipment at the RRI price set by Rouse's pricing tool; and,

e.   Rouse empowered the Rental Defendants to enforce the collective Rouse prices.

124.    Defendants' conduct in furtherance of their unlawful scheme was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

125.    The relevant market is the product market for Rental Equipment, and the relevant geographic market is the United States.

126.    Defendants' regular information exchanges though Defendant Rouse and its systems reflected an independent concerted action between and among horizontal competitors in the relevant market. Each Defendant voluntarily furnished competitively sensitive information with the understanding it would be reciprocated.

127.    Rouse enforced this understanding by requiring the Rental Defendants to share data to receive comparable data. The agreement to regularly exchange price, supply, inventory, and production information through Rouse's systems suppressed competition between the Rental Defendants and required the assistance of Rouse.

128.    The strategic information obtained through Rouse and its systems was a material factor in the decision to inflate prices for Rental Equipment during the Class Period.

129.    Defendants undertook this information exchange in furtherance of a price- fixing agreement, which is unlawful *per se*. Alternatively to Count 1's price-fixing claim, Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

130.    Defendants' information exchange has had the effects of: (1) reducing and suppressing competition among Defendants in the market for Rental Equipment; and (2) inflating the price of

Rental Equipment during the Class Period. As a result of this conduct, Plaintiff and Class members have been injured in their business or property by paying artificially inflated prices for Rental Equipment during the Class Period.

131.    For this conduct, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Sections 4 and 26 of the Clayton Act (15 U.S. Code §§ 15 and 26).

## COUNT 3

### Unjust Enrichment (On Behalf of a Nationwide Class)

132.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

133.    Plaintiff pleads this legal theory separately and alternatively from the legal  theories pled in Counts 1 and 2.

134.    Through Defendants' systematic exchange of competitively sensitive data, the Rental Defendants have artificially increased the price of Rental Equipment charged to Plaintiff and members of the Class.

135.    The Rental Defendants have collected artificially high rents for Rental Equipment from Plaintiff and members of the Class.

136.    The Rental Defendant shave been unjustly enriched by retaining the artificially  high rents for Rental Equipment collected from Plaintiff and members of the Class.

137.    The retention of these rents by the Rental Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiff and members of the Class.

## X. PRAYER FOR RELIEF

138.    WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests that:

a.    The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class, once certified;

b.    The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their Co-Conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of antitrust and competition laws as alleged above;

c.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

d.    Awarding damages, including treble damages, for Defendants' violations of the Sherman Act (15 U.S.C. § 1);

e.    The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

f.    The Court award Plaintiff and members of the Class such other and further relief as

the case may require and the Court may deem just and proper under the circumstances.

## XI.  JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

DATED:  August 7, 2025                                         Respectfully submitted,


*Seth R. Lesser*
Seth R. Lesser (Bar No.: CT 27068)
**KLAFTER LESSER LLP**
Two International Drive, Suite 350
Rye Brook, NY 10573
Telephone: 914.934.9200
Facsimile: 914.934.9220
seth@klafterlesser.com

Tyler W. Hudson
(*pro hac vice forthcoming*)
Eric D. Barton
(*pro hac vice forthcoming*)
**WAGSTAFF & CARTMELL LLP**
4740 Grand Ave. Ste. 300
Kansas City, MO 64112
816.701.1100
thudson@wcllp.com
ebarton@wcllp.com

***Attorneys for Plaintiff***